In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-1278

IRINEO CUENCA BRITO,

*Petitioner*,

*v.*

MERRICK GARLAND, Attorney General of the United States,

*Respondent*.

———————————

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A205-990-502

———————————

ARGUED NOVEMBER 8, 2021 — DECIDED JULY 7, 2022

———————————

Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Irineo Cuenca Brito, a citizen of Mexico, seeks our review of a decision by the Board of Immigration Appeals denying his petition for deferral of removal under the United Nations Convention Against Torture. He advances three legal challenges to that decision. But seeing no legal error, we deny Brito's petition for review.

**I**

A

Irineo Brito first unlawfully entered the United States in or before 2013. On June 3, 2013, the Department of Homeland Security ordered him removed. Brito then illegally reentered again sometime prior to 2019. And he once again came to the attention of immigration authorities. On July 24, 2019, DHS issued a second notice of removal against him.

Brito applied for withholding of removal under the Immigration and Nationality Act and withholding or deferral of removal under the United Nations Convention Against Torture (often shorthanded as "CAT"), claiming that he would be subject to persecution and torture if removed to Mexico. Those applications led to a hearing before an immigration judge where, in support of his claim, Brito offered his own testimony and that of Dr. Harry Vanden, an expert in Mexican cartels.

Brito testified first, explaining that he had fled Mexico because of threats he received from the Familia Michoacan cartel. He recounted that, sometime in the summer of 2013, rumors began to spread around his hometown of Acatlán del Rio that the cartel was coming to the area. Before long, those rumors proved true and members of the cartel made their way into the region. Brito, who worked as a fisherman, described walking home from work one day when cartel members confronted and abducted him at gunpoint. He does not know why the cartel sought him out. By Brito's account, the cartel members then transported him to a boat dock in an apparent effort to receive some type of help from him.

Brito's testimony went on. Near the end of the hours-long captivity, he seized a moment in which his captors were preoccupied to make his escape. Ignoring the threats the cartel members had made against him to prevent him from leaving, Brito testified that he used a small boat to slip away from the cartel's grasp. As he fled, he saw bullets hit the water around him.

Brito testified that after his escape, he returned to his neighborhood only to find that his home had been ransacked by the cartel. He believed that the upending of his house evidenced the cartel's efforts to seek him out. He added that, while in the cartel's custody, he overheard some of its members say over a two-way radio, "We're here at the house, but [I]rineo is not here." Fearful that remaining in Mexico would put his life at risk, Brito and his wife made their way to the United States to seek refuge.

For his part, Dr. Vanden testified that the Familia Michoacan cartel is a large, powerful organization with the ability to operate in any region of Mexico. Given that power, he went on, the organization would likely torture and kill anyone who frustrated its activities. In Brito's case, Dr. Vanden posited, the cartel would seek him out to exact revenge for his escape from the boat dock. Finally, Dr. Vanden described how, in part because of the Mexican government's history of acquiescing to or even colluding with the cartel, it would be nearly impossible for Brito to avoid the wrath of the organization. In short, when asked if he believed Brito would be at risk of torture if sent back to Mexico, Dr. Vanden answered by saying, "Yes, I do."

Based on this evidence, Brito argued that he faced a credible threat of persecution or torture in Mexico and was

therefore entitled to withholding of removal and thus to re-
main in the United States.

B

Concluding that the record failed to show that Brito faced
a threat of imminent death based on account of his member-
ship in a protected class, the immigration judge denied his re-
quest for withholding of removal under the Immigration and
Nationality Act. But because there was sufficient evidence
that Brito faced a substantial risk of torture at the acquies-
cence of the Mexican government, the immigration judge
granted Brito deferral of removal under CAT. See 8 C.F.R.
§§ 1208.16, 1208.17, 1208.18.

The immigration judge found credible Brito's claims that
he had faced a near-death experience in his hometown and
concluded that, as described by Dr. Vanden, the cartel would
find and kill him if he returned to any part of Mexico. The
immigration judge further determined that Mexican authori-
ties would be of no help to Brito given Dr. Vanden's testimony
about the government's reputation for submission to and col-
lusion with the Familia Michoacan cartel.

On appeal, the Board of Immigration Appeals vacated the
immigration judge's decision and ordered Brito removed to
Mexico. Even reviewing the immigration judge's determina-
tion deferentially, the Board found that the decision reflected
several significant errors. As to Brito's risk of torture, the
Board saw no factual support for the finding that the Familia
Michoacan sought him out specifically or was even aware of
his identity. Rather, "[Brito] testified that although he heard
his name referenced over the radio, the cartel members who

detained him did not know who he was or that he was the same person mentioned over the radio."

Relatedly, the Board determined that there was not enough evidence to support the contention that Brito faced an individualized and substantial risk of torture upon his return to Mexico. Dr. Vanden's testimony, the Board reasoned, failed to go beyond generalities and speculation. Likewise, the immigration judge's conclusion that Brito could not relocate within Mexico lacked evidentiary support, rooted itself in generalities about corruption within the Mexican government, and was "too speculative in the present case."

Finally, concerning the possibility that the Mexican government might assent to torture exacted upon Brito, the Board concluded that the immigration judge's determination constituted error. The evidence Brito presented—largely describing "the general inadequacies and corruption in the Mexican government"—was insufficient to support a finding that the Mexican government either was aware of the cartel's threat or acquiesced and would continue to acquiesce to any harm.

Brito then filed this petition for our review.

## II

Brito brings three challenges to the Board's decision that he casts as legal errors. No doubt he proceeds this way recognizing that discretionary decisions are outside our purview: we only have jurisdiction to hear constitutional or legal challenges to the Board's conclusion. See 8 U.S.C. §§ 1252(a)(2)(B)(ii), (a)(2)(D); see also *Rosiles-Camarena v. Holder*, 735 F.3d 534, 536 (7th Cir. 2013).

A

All agree that the Board reviews an immigration judge's decision for clear error. See *Estrada-Martinez v. Lynch*, 809 F.3d 886, 889 (7th Cir. 2015). Brito contends that the Board, while formally recognizing this standard, failed to apply it and instead employed a less deferential standard and engaged in impermissible fact finding. He is right that if the Board had applied the wrong legal standard of review, relief is warranted. See *id.* at 894 (interpreting 8 C.F.R. § 1003.1(d)(3)(i) as "preclud[ing] the Board from simply reweighing the evidence to reverse the immigration judge").

But a fresh look at the record does not support Brito's contention. See *Lenjinac v. Holder*, 780 F.3d 852, 854 (7th Cir. 2015) ("Whether the BIA applied the proper standard of proof is a question of law subject to *de novo* review."). The Board stated its use of the clear error standard of review at least five times. To be sure, merely parroting the proper standard of review does not immunize the Board's decision from further review. For example, in *Estrada-Martinez*, we concluded that although the Board professed to have applied the clear error standard of review to an immigration judge's determination, its reweighing of evidence revealed the application of a less deferential and legally incorrect standard. See 809 F.3d at 894–95 (emphasizing that the Board's explanation that it was "not persuaded" by the evidence showed that it exceeded clear error review).

But here the Board did not just state the correct standard of review—it applied it. Two reasons support this conclusion.

*First*, by and large, the Board grounded its decision in a determination that Brito's evidence on all material points was

too speculative. In assessing Brito's risk of torture, for instance, the Board determined that the immigration judge's conclusion that the cartel knew of Brito's identity lacked support in the record. The evidence Brito offered was "not indicative of whether the cartel has identified the applicant as the individual who fled and will seek to harm him upon his return." Similarly, the evidence did not show that the cartel members had or would target Brito as a victim of torture—he had encountered the cartel only once and "the assertions of [Dr. Vanden] that the cartel would seek revenge for the applicant's actions were general and speculative in nature."

Nor, the Board concluded, did the evidence show that the Mexican government would be unable or unwilling to protect Brito. Although Dr. Vanden testified that the cartel had ties to public officials and that authorities had been unsuccessful at fully combatting cartel violence, those generalized opinions "d[id] not show that [Brito] would specifically be targeted for torture by the government or with its consent or acquiescence." These determinations, the Board found, constituted clear error.

A broader point warrants mention. A conclusion that a decisionmaker rested a finding on speculation is not an uncommon basis for clear error reversal. See, *e.g.*, *Pyles v. Nwaobasi*, 829 F.3d 860, 868 (7th Cir. 2016) ("Where the evidence underlying a fact, including credibility, supports only speculation about the existence or nonexistence of the contested point, it is clear error to conclude that the point has been established."). Just so here: a determination that the evidence does not support an immigration judge's conclusion does not necessarily establish that the Board improperly weighed the evidence.

*Second*, we see no indication that the Board did anything other than review the immigration judge's ruling for clear error. Other circuits have pointed to specific indicia of de novo review under the guise of clear error. The Ninth Circuit, for example, has explained that a Board decision that "does not address the [immigration judge's] 'key factual findings,'" "gives more weight to certain facts in the record than others," or fails to explain how the immigration judge's "alleged errors showed [a] lack of logic, plausibility, or support in the record" suggests the use of a standard of review less deferential than clear error. *Soto-Soto v. Garland*, 1 F.4th 655, 659–60 (9th Cir. 2021). We see nothing of the sort in the Board's decision sustaining the Department's appeal.

Because we cannot conclude that the Board's assessment reflects a standard other than the one it stated—clear error—we see no basis to grant Brito's petition for relief under CAT.

B

We make quick work of Brito's second argument that the Board lacked authority to act in reviewing his petition. He contends the Board that decided his appeal consisted of two members who served beyond their six-month terms of appointment, see 8 C.F.R. § 1003.1(a)(4), thereby leaving them without authority to act and rendering their decision unlawful and unenforceable.

What Brito fails to recognize is that after the two temporary Board members' six-month terms had expired, the Attorney General reappointed both members to an additional term of six months. Because Brito's immigration appeal was within that second six-month period, he cannot show the Board adjudicated his petition without lawful authority.

C

Brito's final contention is that the Board committed legal error by accepting an untimely brief from the Department of Homeland Security. The record shows that DHS submitted its brief in support of its administrative appeal on June 12, 2020—eight days past the filing deadline. Accompanying the brief was a motion asking the Board to accept the late filing. The government justified its delay by pointing out that, because of the COVID-19 pandemic, it received the briefing schedule the day before the deadline. Moreover, the pandemic—and a period of civil unrest—resulted in an effective shutdown where the Department was left to work with only minimal staff. The Board, exercising its discretion, decided to accept the government's late brief, expressly noting that it acknowledged the arguments raised by Brito but that "under the circumstances described by the DHS," the late filing was excusable.

We know of no legal prohibition on the Board's choosing to accept an untimely brief in these circumstances. To the contrary, federal regulations afford the Board such discretion. See 8 C.F.R. § 1003.1(d)(2)(i)(E) ("A single Board member or panel *may* summarily dismiss any appeal or portion of any appeal" if a party fails to file a brief "within the time set for filing.") (emphasis added); *id.* § 1003.3(c)(2) ("In its discretion, the Board may consider a brief that has been filed out of time."). Indeed we have acknowledged this discretion on prior occasions. See, *e.g.*, *Awe v. Ashcroft*, 324 F.3d 509, 513–14 (7th Cir. 2003) (denying a petition for relief despite the petitioner's challenge to the Board's summary dismissal of his late filing).

On this record, we see no error, legal or otherwise. The Board could have rejected DHS's late brief and dismissed the

appeal, but it was not legally compelled to do so. The government offered reasons for its untimely filing—all relating to the unforeseen and overwhelming administrative challenges wrought by the COVID-19 pandemic—and the Board found those reasons persuasive, despite Brito's opposing arguments. Any claim that the Board failed to exercise its proper discretion or ignored Brito's arguments is unavailing.

Seeing no legal or constitutional error in any part of the Board's determination as to Brito's petition for relief under CAT, we deny his petition for review.

JACKSON-AKIWUMI, *Circuit Judge*, dissenting. The majority
is correct that the Board of Immigration Appeals had discre-
tion to accept the Department of Homeland Security's un-
timely brief rather than summarily dismiss the appeal. But
discretion must be thoughtful and reasoned. Here, despite the
BIA's regulations to the contrary, the BIA accepted the gov-
ernment's brief with a cursory footnote. One might think that
the BIA's brief footnote is unremarkable, and that pausing to
focus on it is a mere quibble about procedure. But our prece-
dent requires the BIA to do more than adopt DHS's reasoning
at face value, especially when the BIA flouts its own rules in
the process. The BIA's decision in Cuenca Brito's case risks
creating different standards for noncitizens and DHS—where
noncitizens must strictly comply with rules, but DHS has the
leeway to treat rules as guidelines and avoid the dismissal of
its appeals. I would remand the case for reconsideration of
DHS's deficient motion.

## I

The majority summarizes the key facts of Cuenca Brito's
case, so I recite only the relevant procedural history. After the
immigration judge granted Cuenca Brito deferral of removal
under the Convention Against Torture, DHS appealed to the
BIA. DHS checked the box on its notice of appeal that it would
file a written brief. The form for a notice of appeal warns liti-
gants that if they indicate that they plan to file a brief, "[t]he
Board may summarily dismiss your appeal if you do not file
a brief or statement within the time set in the briefing sched-
ule."

On May 14, 2020, the BIA notified both parties that briefs
were due on June 4, 2020. The notice warned the parties that
"[i]f you fail to file a brief or statement within the time set for

filing in this briefing schedule, the Board may summarily dismiss your appeal." The notice further specified that any extension requests should be in the BIA's hands "on or before the expiration of the initial briefing schedule" and "[r]equests for extension of briefing time *received after* expiration of the initial briefing schedule, *will not be granted*."

The June 4 deadline arrived. Cuenca Brito filed his brief on time. But DHS filed neither a brief nor a request for an extension. Instead, DHS took no action until it filed its opening brief just over a week later, on June 12. DHS simultaneously filed a motion, with no attachments, to accept the untimely brief. The motion consisted of a single paragraph, reproduced below in its entirety:

> The Department of Homeland Security (Department) respectfully moves the Board of Immigration Appeals (Board) to accept late filing of the attached brief in support of its position in the instant matter. Pursuant to the BIA Practice Manual, parties may file untimely documents if delay was due to a natural or manmade disaster. *See* BIA Practice Manual at Chapter 3.l(b)(v). In this case, although the briefing schedule is dated May 14, 2020, the Department did not receive the notice in the mail until June 3, 2020 and the undersigned attorney did not become aware of it until June 4, 2020. In addition to the on-going COVID-19 pandemic, which has delayed mail service and required many agencies including the Department to operate with a skeletal staff, the Office of the Principal Legal Advisor Office and much of the city of Chicago was

> closed June 1–2, 2010 [sic], due to civil unrest. This late filing was unintentional, not for the purpose of delaying proceedings, and will not be prejudicial to the respondent. Given the overall facts and circumstances, the Department respectfully requests that this Board grant the instant motion.

Cuenca Brito opposed DHS's motion in a fulsome filing. He noted that DHS's motion lacked evidentiary support and therefore did not comply with BIA policy. He also argued that DHS's reasons for submitting a late brief did not sufficiently explain how the circumstances DHS faced were unique compared to any other litigant, including Cuenca Brito himself. In Cuenca Brito's view, DHS should not be permitted to use the pandemic and George Floyd protests as "a catch all excuse" for its delay. Moreover, Cuenca Brito observed, DHS admitted in its motion that it was fully aware of the briefing schedule before the June 4 deadline yet chose not to file an extension request. Finally, Cuenca Brito criticized DHS's motion as "an approach of 'it's easier to ask for forgiveness than permission.'"

The BIA reversed the IJ's grant of relief to Cuenca Brito, paving the way for his certain removal from the United States. At the beginning of the decision, the BIA addressed DHS's motion in a two-sentence footnote: "We acknowledge that the DHS's brief was untimely filed and the arguments raised by the applicant in their response … However, under the circumstances described by the DHS, we will grant their motion to accept the untimely filing and consider the DHS's brief on appeal." Thus, DHS was saved from the summary dismissal of its appeal and, instead, succeeded in its quest to overturn the

IJ's decision granting Cuenca Brito deferral of removal under the Convention Against Torture.

## II

The BIA has discretion to "prescribe procedures governing proceedings before it," including accepting or rejecting late briefs. 8 C.F.R. § 1003.1(d)(4); *see id.* at § 1003.3(c)(1). The BIA's policy is that litigants hoping to have an untimely brief accepted must simultaneously file a motion that explains the reasons for the delay, which in turn "should be supported by affidavits, declarations, or other evidence." BIA Practice Manual § 4.7(d); *see also id.* at § 3.1(b)(5) (requiring same evidentiary basis for claims of delay due to natural or manmade disasters). The BIA considers late-filed briefs "rarely," and in the case of disasters, "on a case-by-case basis." *Id.* at §§ 3.1(b)(5), 4.7(d). The BIA can summarily dismiss an appeal when the appellant indicates on their notice of appeal that they will file a brief "and, thereafter, does not file such brief or statement, or reasonably explain [their] failure to do so, within the time set for filing." 8 C.F.R. § 1003.1(d)(2)(i)(E); BIA Practice Manual §§ 4.7(f), 4.16(c).

We review the BIA's decision regarding a motion to file an untimely brief for abuse of discretion. *Gutierrez-Almazan v. Gonzales*, 491 F.3d 341, 343 (7th Cir. 2007) (citation omitted). The BIA abuses its discretion if it renders its decision "'without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis such as invidious discrimination against a particular race or group.'" *Herrera-Garcia v. Barr*, 918 F.3d 558, 563 (7th Cir. 2019) (citation omitted). Furthermore, although "the BIA is not required to write an exegesis on every contention," we nonetheless require the BIA to "consider the issues raised, and [to] announce

its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Gutierrez-Almazan*, 491 F.3d at 343–44 (citation omitted).

## III

This case presents the unique situation where DHS—not the petitioner—is the one who asked for the BIA's grace after missing a deadline. Judged by our own caselaw, the BIA's footnote accepting the untimely brief amounts to an abuse of discretion for three reasons: (1) the BIA ignores its own policies; (2) provides insufficient reasoning; and (3) fails to engage with Cuenca Brito's multiple arguments opposing the acceptance of DHS's late brief.

First, the BIA departed from its own written policies without explanation. *See Herrera-Garcia*, 918 F.3d at 563 (citation omitted). The BIA requires motions for late filed briefs to "be supported by affidavits, declarations, or other evidence," BIA Practice Manual § 4.7(d), including when the brief is allegedly delayed due to a natural or manmade disaster. *Id.* at § 3.1(b)(5). DHS did not provide any corroborating evidence—not even "a bare, uncorroborated, self-serving" declaration. *Joshi v. Ashcroft*, 389 F.3d 732, 735 (7th Cir. 2004). Despite this blatant omission, the BIA granted the motion without indicating why DHS did not need to comply with this express policy. For the BIA to decide its rule need not apply in these circumstances, but offer no reasoned explanation why, is to adjudicate matters capriciously.

Second, the BIA's decision leaves us with no understanding of what went into its decision-making process, in contravention of our caselaw. In *Gutierrez-Almazan*, the BIA rejected

the noncitizen's explanation for why his brief was untimely as "insufficient" in one sentence, without any elaboration. 491 F.3d at 344. We vacated that determination because the BIA gave "this Court no indication that it took account of [the noncitizen's] pro se status, education, language skills, or any other factors that might be relevant to the merits of his motion." *Id.* In *Dakaj v. Holder*, the BIA denied a motion to file a late brief by a noncitizen who claimed he never received the briefing schedule. 580 F.3d 479, 482 (7th Cir. 2009). We vacated that decision and remanded for reconsideration of the motion because the BIA failed to consider the petitioner's corroborating evidence. *Id.* at 483–84. These cases demonstrate that the BIA must provide some explanation to litigants—and a reviewing court—about how it reached a conclusion. Handwaving does not suffice.

In this case, the BIA's legal analysis employed a single phrase: the BIA granted the motion "under the circumstances described by the DHS." Indeed, this case is the inverse of *Dakaj*, where the BIA failed to consider the noncitizen's corroborating evidence that he never received the briefing schedule. 580 F.3d at 483–84. Here, DHS provided *no* supporting evidence, but the BIA still found DHS's uncorroborated, generalized allegations sufficient. DHS's motion is merely a recitation of facts—it received the notice late; it had limited staff due to the pandemic; and downtown Chicago was closed for two days. DHS does not illuminate how these facts completely barred it from acting in a timely manner, particularly when a boilerplate extension request was available and other litigants were expected to meet deadlines despite the

pandemic and civil protests.[1] I cannot square the majority's decision here with our decision in *Dakaj*.

Third, the BIA did not engage with any of the arguments Cuenca Brito raised in opposition to DHS's motion. *See Gutierrez-Almazan*, 491 F.3d at 343–44 (citation omitted) (the BIA "is required to 'consider the issues raised'" by the parties). The BIA only "acknowledge[d]" that Cuenca Brito made arguments; it did not address the merits, even hastily.

For example, Cuenca Brito noted that DHS failed to provide any documentary evidence in support of its contentions about the effect of the pandemic and the George Floyd protests. Cuenca Brito contrasted this with the fact that his attorney was able to file a timely brief even though his attorney's own office building was damaged. The BIA did not engage with either observation or, as discussed above, with DHS's failure to adhere to BIA's policies.

Cuenca Brito also questioned the reasoning in DHS's motion. He argued that a limited staff did not explain DHS's inability to file a timely brief. Indeed, DHS presumably handled other cases during that time, so it is hard to glean from its motion how limited staffing affected its capacity in this case. The fact that DHS's local office was closed for two days in June also carries significantly less weight when one recalls that DHS knew it wanted to file a brief in this case—an appeal it

---

[1] In fact, DHS's departure from BIA policy—as opposed to an individual petitioner's departure—is arguably more egregious. DHS is a repeat player in immigration court and before the BIA, and part of the executive branch that oversees the immigration system. If anyone should be held accountable for failing to comply with administrative procedures, it is the party who is an arm of the governmental body that operates as judge and jury in these cases.

initiated—since February 2020. The BIA was silent on these points.

Cuenca Brito pointed out that DHS admitted that it received the briefing schedule before June 4, but it never bothered to file an extension request or explain why it could not do so. Instead, it charted its own path, which the BIA blithely endorsed. The BIA's footnote did not contend with this argument either.

Cuenca Brito's final argument in opposition concerned DHS's contention that it did not receive the May 14 briefing schedule in the mail until June 3 (Cuenca Brito noted that *he* received the notice despite being in DHS custody). Two observations here. One, we have held that "[t]he BIA is entitled to presume that a notice sent via regular mail was delivered to the recipient to whom it was addressed," absent evidence to the contrary. *Dakaj*, 580 F.3d at 482 (citation omitted). Two, we have held that "a bare, uncorroborated, self-serving denial of receipt"—even in an affidavit—is generally insufficient to overcome this presumption. *Derezinski v. Mukasey*, 516 F.3d 619, 622 (7th Cir. 2008) (quoting *Joshi*, 389 F.3d at 735). If the BIA can assume that a noncitizen has received notice when it is mailed, it can and should hold DHS to the same standard. The BIA did not address this fourth argument by Cuenca Brito any more than it did the preceding three.

Ultimately, the BIA's cursory footnote granting DHS's plainly deficient motion suggests we have a system with different rules for different players. We often affirm cases where the BIA rejected an individual's plea for leniency after missing a date due to a mishap at the post office or an agent's failure to inform the individual. *See, e.g.*, *Derezinski*, 516 F.3d at 622 (affirming BIA denial of motion to reopen where

petitioner did not receive mail, because petitioner could have tracked down notice after post office said that certified mail had been returned to sender); *Cisneros-Cornejo v. Holder*, 330 F. App'x 616, 620–21 (7th Cir. 2009) (affirming BIA denial of motion to reopen where petitioner did not receive mail, because petitioner should have provided even more evidence than her own affidavit); *see also Weihua Qu v. Sessions*, 733 F. App'x 303, 306–07 (7th Cir. 2018) (attorney and interpreter failed to inform noncitizen of hearing date); *Simtion v. Gonzales*, 233 F. App'x 578, 580–81 (7th Cir. 2007) (attorney informed only the spouse—not the client—of hearing the day before). The BIA came to the opposite conclusion in this case, and the only glaring difference is who the litigant is. A difference in the moving party should not change the application of law. *Cf. Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021) ("If [individuals] must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them."). I can only hope that the BIA's disparate treatment of the litigants in this case is an aberration—and not a feature—of our immigration system.[2] On this ground, I respectfully dissent.

---

[2] There does not appear to be a definitive study about the rate at which the BIA summarily dismisses appeals from noncitizens as compared to DHS, but one study cast an ominous shadow when it concluded that "the BIA is more likely to reverse the decisions of generous judges when the government appeals, but is not more likely to reverse the decisions of harsh judges when immigrants appeal." David Hausman, *The Failure of Immigration Appeals*, 164 U. Pa. L. Rev. 1177, 1192 (2016).